IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MELISSA MICHELE JONES                                     PLAINTIFF

V.                          CIVIL NO. 16-5270

NANCY A. BERRYHILL,[1] Commissioner
Social Security Administration                           DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Melissa Michele Jones, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) under the provisions of Titles II and XVI of the Social Security Act (Act).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. §405(g).

I.      **Procedural Background:**

Plaintiff filed her applications for DIB and SSI on April 10, 2014, alleging disability since April 10, 2009, due to lipoma, hypertension, diabetes mellitus, osteoarthritis, and bone spurs. (Tr. 94, 103, 115, 128, 150, 153, 159, 162, 237-249).  An administrative hearing was held on February 18, 2015, at which Plaintiff appeared with counsel and testified. (Tr. 34-87).  By written decision dated July 13, 2016, the ALJ found that during the relevant time period,

---

[1] Nancy A. Berryhill, has been appointed to serve as acting Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

Plaintiff had an impairment or combination of impairments that were severe. (Tr. 11). Specifically, the ALJ found Plaintiff had the following severe impairments:  diabetes, hypertension, cervical lipoma, degenerative disc disease, obesity and reading problems. (Tr. 11).  However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 14).  The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can frequently rotate, flex and extend her neck, frequently reach bilaterally, including reaching overhead, and frequently operate foot controls with her right lower extremity.  In addition, she is limited to jobs that do not require complex written communication.

(Tr. 17-18).

With the help of the vocational expert (VE), the ALJ determined that during the relevant time period, Plaintiff did not have any past relevant work, but that there were other jobs Plaintiff would be able to perform, such as production assembler and newspaper deliverer. (Tr. 24-25).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on August 26, 2016. (Tr. 1-4).  Subsequently, Plaintiff filed this action. (Doc. 1).  Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (Docs. 11, 13).

## II.    Evidence Presented:

At the time of the administrative hearing held on February 18, 2015, Plaintiff was forty-seven years of age and had completed the eleventh grade, but did not obtain a General

Equivalency Diploma (GED). (Tr. 44).  The ALJ determined that Plaintiff's work experience did not constitute past relevant work. (Tr. 24-25).

A review of the pertinent medical evidence reflects the following.  On February 26, 2009, Plaintiff went to the emergency department of Siloam Springs Memorial Hospital (SSMH) reporting symptoms of a panic attack with chest pain and midsternal chest pressure. (Tr. 621-626).   A chest X-ray revealed no evidence of acute disease. (Tr. 625). Dr. Robert Maul, Jr. diagnosed her with costochondritis and prescribed Norco. (Tr. 622-624).

The medical evidence continues after the alleged onset date of April 10, 2009.  On July 27, 2009, she went to the emergency department of SSMH complaining of left knee pain. (Tr. 604-613).   A left knee X-ray revealed moderate joint effusion in association with mild irregularity posterior medial aspect of the tibial plateau. (Tr. 611).  She was diagnosed with left knee strain and instructed to follow up with an orthopedic evaluation. (Tr. 606, 608).

On December 15, 2009, Plaintiff went to the emergency department of SSMH and complained of chest pain that worsened with deep breaths. (Tr. 628-640).   An electrocardiogram (EKG) was normal with ST elevation. (Tr. 632).   A chest X-ray showed a normal size heart and clear lungs. (Tr. 638).  Dr. Robin McAlister diagnosed her with acute chest pain, pleuritis, reactive airways, and hyperglycemia. (Tr. 632).

On May 3, 2010, Plaintiff returned to the emergency department of SSMH, and she complained of radiating pain after the return of a lipoma on the posterior neck. (Tr. 642-644, 652).   Plaintiff had not been taking hypertension or diabetes medications because she reportedly could not afford the medications. (Tr. 643).  A computerized tomography (CT) scan of her neck revealed mild thyromegaly and no mass or abscess. (Tr. 644, 652).   She was diagnosed with neck pain and cellulitis of the posterior neck. (Tr. 644).

On May 19, 2010 and June 9, 2010, Plaintiff went to the emergency department of SSMH complaining of chest pain and was diagnosed both times with chest pain. (Tr. 653-675). Plaintiff again reported that she was not taking her diabetes and hypertension medications due to lack of funds. (Tr. 654).

On June 27, 2010, Plaintiff presented to the emergency department of SSMH complaining of anxiety after witnessing a family fight. (Tr. 676-682).   Again, she was noncompliant with her medications. (Tr. 677).   Plaintiff was diagnosed with anxiety, hypertension, and diabetes. (Tr. 680).

Plaintiff's first physical consultative examination was performed on July 7, 2010 by Dr. Tad M. Morgan. (Tr. 436-440).  Plaintiff reported smoking eight cigarettes a day and was attempting smoking cessation. (Tr. 436).  She stated to Dr. Morgan that her left knee felt unstable on occasion. (Tr. 437).  Plaintiff reportedly could walk one block continuously, but then she had to stop and rest for ten minutes. (Tr. 437).  An examination showed that she was 71.75 inches tall, weighed 321.25 pounds, and her blood pressure was 140/90. (Tr. 437). Plaintiff had a supple soft tissue mass on her neck, a normal range of motion in her extremities and spine, and a negative straight leg raising exam bilaterally. (Tr. 438-439).  Dr. Morgan noted that she had normal reflexes, no muscle weakness or atrophy, and normal gait or coordination. (Tr. 439).  Plaintiff could not walk on heel and toes because it made her feet hurt, and she could not squat or arise from a squatting position due to her left knee. (Tr. 439).

Dr. Morgan diagnosed her with non-insulin dependent diabetes mellitus, recent onset by history; soft tissue mass on the posterior of neck, clinical significance; knee pain with unknown etiology; and chest pain that was non-cardiac by history. (Tr. 440).  Dr. Morgan assessed that Plaintiff had mild limitations to walk, stand, lift, or carry. (Tr. 440).

Plaintiff began going to the Community Clinic in Siloam Springs for medical care. On July 8, 2010, she went to the clinic for diabetes medications and a follow up regarding smoking cessation. (Tr. 569-572). Plaintiff reported she was down to ten cigarettes per day and planned to reduce it to six the next day. (Tr. 569). Plaintiff stopped taking Lorazepam because she stated it made her mean. (Tr. 569). She was not taking any medications because she reportedly could not afford them. (Tr. 569). Her glucose was 276 at the office visit. (Tr. 569). Ms. Vicki Moore, A.P.N. diagnosed her with uncontrolled diabetes and depression with anxiety. (Tr. 569). Ms. Moore prescribed Metformin, Paxil, and Atenolol. (Tr. 570-571).

On July 15, 2010, Plaintiff returned to the Community Clinic. (Tr. 567-568). Plaintiff reported Paxil was helping. (Tr. 567). She reported having trouble sleeping and would still get dizzy at times. (Tr. 567). Ms. Moore referred the Plaintiff to diabetes education and started Doxepin. (Tr. 568).

On July 22, 2010, Plaintiff went to the Community Clinic for an initial diabetes education visit. (Tr. 565-566). Ms. Bettie Skelton, R.N., C.D.E. noted that Plaintiff cared for small children, did housework, and was up to walking ten minutes a day. (Tr. 565). Plaintiff reported Doxepin was not helpful, but she had been getting four hours of sleep at night rather than just two hours. (Tr. 565). Plaintiff was instructed to monitor capillary blood glucose (CBG) twice a day and record the results, continue the exercise plan, and stop drinking sugared sodas. (Tr. 566).

On July 29, 2010, Plaintiff returned to the Community Clinic. (Tr. 563-564). Plaintiff reported she was feeling good, food was beginning to taste better, her exercise was up to 15 minutes, and she was pleased with her weight loss. (Tr. 563). Ms. Skelton wrote that Plaintiff's CBG was uncontrolled, but during the office visit it was down to 205. (Tr. 563). The interim

goal for the Plaintiff was a five percent weight loss in 8-16 weeks and to increase activity to 30 minutes a day. (Tr. 563-564).

On August 17, 2010, non-examining consultant, Dr. Patricia McCarron completed a Physical Residual Functional Capacity Assessment. (Tr. 441-448).  Dr. McCarron found that Plaintiff could occasionally lift and/or carry, including upward pulling, ten pounds. (Tr. 442). Dr. McCarron found Plaintiff could frequently lift and/or carry, including upward pulling, less than ten pounds. (Tr. 442).  Dr. McCarron assessed Plaintiff could stand at least two hours in an eight-hour workday, sit six hours in an eight-hour workday, and her push and/or pull abilities were unlimited. (Tr. 442).  Dr. McCarron found she had no postural, manipulative, visual, or communicative limitations. (Tr. 443-445).  Plaintiff's environmental limitations were all unlimited with the exception that she should avoid even moderate exposure to dust, fumes, gases, and etcetera due to a history of chronic smoking. (Tr. 445).  Dr. McCarron assessed that the medical evidence records supported a sedentary residual functional capacity with avoidance of even moderate exposure to dust and fumes. (Tr. 448).

On November 1, 2010, Plaintiff went to the emergency department of SSMH due to complaints of chest pain. (Tr. 481-503, 685-700).  Upon examination, she had moderate reproducible chest wall tenderness. (Tr. 484).  A chest X-ray revealed no acute disease. (Tr. 484).  Her glucose was 392, aspartate aminotransferase (AST) was 71, and alanine aminotransferase (ALT) was 189. (Tr. 484).  Dr. Matthew Walter stressed the need for Plaintiff to recheck sugar levels with her primary care physician. (Tr. 484).  Dr. Walter diagnosed Plaintiff with chest wall pain, and she reported feeling better upon discharge. (Tr. 484-485).

On November 26, 2010, Plaintiff returned to the emergency department of SSMH complaining of hyperglycemia due to diabetes. (Tr. 463-480, 701-716).  Her glucose level was

6

534. (Tr. 465).  She was diagnosed with uncontrolled diabetes mellitus and acute cephalgia. (Tr. 465).  The next day, Dr. Jeffrey Hamby discharged her and prescribed Metformin and Glipizide. (Tr. 466).

On December 2, 2010, Plaintiff presented herself to Ozark Guidance for mental health treatment. (Tr. 538-542).  Ms. Donna Copeland, L.P.C. found Plaintiff had an Axis I diagnosis of major depressive disorder that was recurrent, severe without psychotic features, and full interepisode recovery. (Tr. 542).  Notably, Plaintiff was grieving the passing of her mother and other family members. (Tr. 542).  Plaintiff had an additional Axis I diagnosis of alcohol abuse, panic disorder with agoraphobia, amphetamine dependence in early full remission, and bereavement. (Tr. 542).  The Axis II diagnosis was deferred to Axis I and cluster B traits. (Tr. 542).  At Axis III she was found to have diabetes with unspecified complication type II, neck pain, knee pain, and obesity. (Tr. 542).  Her global assessment of functioning (GAF) score was 45. (Tr. 542).  Ms. Copeland found Plaintiff had social environment, education, access to health care, occupational, and economic problems. (Tr. 542).  Plaintiff reported that she had not worked since her mother passed away in 1998. (Tr. 542).  The recommended treatment was crisis stabilization, family and individual therapy or counseling, intervention, and medication management. (Tr. 542).

On December 21, 2010, Plaintiff went to the emergency department of SSMH requesting medication after becoming upset when her children began fighting. (450-462, 717-727).  A psychological review of her symptoms showed she was agitated, anxious, and frustrated.  Her glucose level was at 430. (Tr. 453).  Plaintiff was diagnosed with acute anxiety, uncontrolled diabetes mellitus, and noncompliance with medication. (Tr. 453).  Dr. Hamby prescribed her Paroxetine and Glucophage. (Tr. 453).

On January 4, 2011, Plaintiff returned to Ozark Guidance to complete a master treatment plan with Ms. Copeland and Dr. Ford. (Tr. 549-553).  Her diagnosis remained the same from the December 2, 2010 assessment, and Dr. Ford confirmed Plaintiff had depression and anxiety. (Tr. 550-551).  The possible need for Plaintiff to take medication was noted. (Tr. 551).  The initial plan was for individual therapy or counseling every three weeks, a psychiatric consultation, monthly medication management if needed, and monthly intervention including nursing and nutritional consultations. (Tr.551-552).  The long-term goal target date was set for April 4, 2011. (Tr. 550-551).

On January 25, 2011, Plaintiff underwent a mental consultative examination conducted by Dr. Terry L. Efird. (Tr. 505-509).  Plaintiff reported having a history of depression and anxiety symptoms since her mother's death in 1998, anxiety attacks twice a week, crying frequently, and a recognition that her symptoms have become more severe. (Tr. 505).  Paroxetine was prescribed through the Community Clinic with no reported side effects. (Tr. 506).  She reportedly has been prescribed psychiatric medications for about ten years, and the current medications had been a little helpful. (Tr. 506).  Plaintiff reported suicidal ideations on occasion. (Tr. 505).  Plaintiff had a history of drug use, but she denied current illegal substance use. (Tr. 506).  Dr. Efird noted that her affect was appropriate, mood was generally dysphoric, and an undercurrent of anger or irritability was indicated. (Tr. 506-507). Fund of general information suggested probably average intellectual functioning, she recalled five digits forward and backward, and she performed serial threes at an adequate pace. (Tr. 507).

Dr. Efird diagnosed Plaintiff with major depressive disorder, moderate; pain disorder without agoraphobia; and her GAF score was 55-65. (Tr. 508).  Dr. Efird wrote that Plaintiff endorsed the ability to shop independently, handle personal finances, and perform most

activities of daily living adequately, but she was impaired to some extent due to physical pain. (Tr. 508).  She reported interacting socially with her friend that lives next door every day and text messaging others daily. (Tr. 508).  Dr. Efird found she communicated and interacted in a reasonably socially adequate, intelligible, and effective manner. (Tr. 508).  Dr. Efird assessed that she had the capacity to perform basic cognitive tasks required for basic work-like activities. (Tr. 508).  No remarkable problems with attention or concentration were noted during the evaluation. (Tr. 508).  Dr. Efird noted she generally completed most tasks during the evaluation, had no remarkable problems with persistence, and appeared to have the mental capacity to persist with tasks if desired. (Tr. 508).  Plaintiff completed most tasks within an adequate time frame, and no remarkable problems with mental pace of performance were found. (Tr. 508).  She could also manage funds without assistance. (Tr. 509).  No evidence of malingering was present. (Tr. 508-509).

On January 31, 2011, non-examining consultant, Dr. Christal Janssen completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment. (Tr. 510-526).  Dr. Janssen cited Listings 12.04, 12.06, and 12.09 as the categories upon which the disposition was based. (Tr. 510).  Listing 12.04 regarded affective disorders, and Dr. Janssen noted Plaintiff had disturbance of mood, accompanied by a full or partial manic or depressive syndrome as evidenced by depressive syndrome. (Tr. 513).  Listing 12.06 regarded anxiety-related disorders, and Dr. Janssen noted Plaintiff had anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms. (Tr. 515).  Plaintiff's anxiety was evidenced by recurrent, severe panic attacks occurring on the average of at least once a week. (Tr. 515).  Listing 12.09 regarded substance addiction disorders, and Dr. Janssen noted Plaintiff had behavioral or physical changes associated with the regular use of substances that affected

9

the central nervous system. (Tr. 518).  Dr. Janssen assessed that Plaintiff had mild limitations with activities of daily living; mild limitations with social functioning; and moderate limitations maintaining concentration, persistence, or pace. (Tr. 520).   No episodes of decompensation were noted. (Tr. 520).

Plaintiff's ability to maintain attention and concentration for extended periods was moderately limited. (Tr. 524).  Dr. Janssen also found she was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 525).  Plaintiff's ability to respond appropriately to changes in the work setting and to set realistic goals to make plans independently of others was also moderately limited. (Tr. 525).  Dr. Janssen assessed that Plaintiff appeared able to perform semi-skilled work, meaning work where interpersonal contact is routine or superficial; complexity of tasks is learned by experience, several variables, judgment in limits; and supervision is little for routine but detailed for non-routine. (Tr. 526).

On September 11, 2011, Plaintiff returned to the emergency department of SSMH complaining of increased posterior neck pain. (Tr. 592-594, 805-808).  Dr. Vance Stock advised that she would need further evaluation by her primary care physician, and it would likely need to be drained, biopsied, or studied further. (Tr. 593).  Plaintiff was prescribed Norco and Cataflam. (Tr. 594).

On December 20, 2011, Plaintiff went to Ozark Guidance and reported that due to the recent death of her brother, she began drinking alcohol and using Methamphetamine. (Tr. 543-544).  Completing a discharge summary, Ms. Copeland noted there was no change in Plaintiff's diagnosis from the initial assessment on December 2, 2010, and the update made on

January 4, 2011. (Tr. 543).  Ms. Copeland found there was no change with evidence of progress in treatment. (Tr. 544).

On May 17, 2012, Plaintiff went to the emergency department of SSMH complaining of neck pain. (Tr. 590-591, 800-804).  Dr. Maul noted she had a 10x16 centimeter soft, freely movable mass on the posterior neck. (Tr. 591).  Dr. Maul diagnosed her with lipoma and acute cervical strain secondary to the lipoma. (Tr. 591).  She was prescribed Norco. (Tr. 591).

On June 5, 2012, Plaintiff went to Ozark Guidance to restart services for depressed moods and panic attacks with agoraphobia. (Tr. 530-537).  Plaintiff stated she did not return previously for services because of lack of funds and no transportation. (Tr. 532).  She reported resolved issues with alcohol and having been off Methamphetamine for 10 years. (Tr. 531). Ms. Copeland found Plaintiff had an Axis I diagnosis of major depressive disorder that was recurrent and severe with psychotic features. (Tr. 536).  Plaintiff had an Axis II diagnosis of panic disorder with agoraphobia. (Tr. 536).   Her Axis III diagnosis was diabetes with neurological manifestations type II, unspecified essential hypertension, and obesity. (Tr. 536). Plaintiff's GAF score was 49. (Tr. 536).  Ms. Copeland found Plaintiff had social environment, education, housing, access to health care, economic, legal system or crime, and other psychosocial or environmental problems. (Tr. 536).  A brief psychiatric assessment, family and individual therapy or counseling, and medication management was recommended. (Tr. 536).

On June 13, 2012, Plaintiff went to the emergency department of SSMH reporting worsening posterior neck pain. (Tr. 587-589, 595-596, 791-798).  A CT scan of the cervical spine revealed degenerative joint disease with a bone spur at the C6-C7 level on the right and a large posterior lipoma. (Tr. 588, 595-596).  Dr. Maul diagnosed her with radiculopathy,

degenerative joint disease of the cervical spine, large lipoma posterior neck, and non-insulin dependent diabetes mellitus. (Tr. 588).  Plaintiff was prescribed Acetaminophen/Oxycodone and Amitriptyline. (Tr. 589).

On June 20, 2012, Plaintiff returned to the emergency department of SSMH. (Tr. 584-586, 781-787).  Dr. Stock incised the mass and serous fluid drainage appeared consistent with a fatty tumor. (Tr. 585).  Dr. Stock advised the Plaintiff that she would have to see a surgeon for removal of the mass. (Tr. 585).  She was prescribed Bactrim and Norco. (Tr. 586).

On August 23, 2012, Plaintiff returned to Ozark Guidance to complete a master treatment plan with Ms. Copeland and Dr. Travis W. Jenkins. (Tr. 545-548).  Her diagnosis remained the same from the June 5, 2012 assessment, and Dr. Jenkins confirmed Plaintiff had depression, excess anxiety, panic, and agoraphobia. (Tr. 546-547).  The plan was for individual therapy or counseling every other week, a psychiatric assessment and if needed, medication management. (Tr. 546-547).  The long-term goal target date was set for November 23, 2012. (Tr. 546-547).

On August 27, 2012, Plaintiff returned to the emergency department of SSMH, and an exploration of the posterior neck cyst revealed only fatty tissue. (Tr. 579-581, 771-775). Dr. Maul diagnosed her with a lipoma, posterior neck; acute cephalgia, non-insulin dependent diabetes mellitus, and a history of bone spur of the cervical spine. (Tr. 580).  Dr. Maul prescribed Percocet and Demerol. (Tr. 581).

On August 29, 2012, Plaintiff went to the Community Clinic and presented with lipoma pain. (Tr. 560-562).  Dr. Leslie Stone noted Plaintiff was given Norco for neck pain, but it did not help her symptoms. (Tr. 560).  Plaintiff reported a history of lipoma removal 15 years ago, but it had since recurred and become increasingly painful. (Tr. 560).  Dr. Stone diagnosed her

12

with lipoma, uncontrolled diabetes, obesity, and tobacco use disorder. (Tr. 561).  Dr. Stone prescribed Tramadol and recommended a surgical referral to remove the lipoma. (Tr. 561).

On September 11, 2012, Dr. Stone diagnosed Plaintiff with uncontrolled diabetes and depression with anxiety. (Tr. 557-558).

On October 15, 2012, Plaintiff presented to the emergency department of SSMH complaining of left chest pain. (Tr. 576-578, 597-600, 762-769).  Plaintiff's glucose level was 217, chest X-ray revealed no acute disease, and an EKG was normal. (Tr. 577, 597-600).  Dr. Hamby diagnosed the Plaintiff with chest wall pain. (Tr. 577).

On December 30, 2012, Plaintiff returned to the emergency department of SSMH complaining of neck pain that caused headaches and chest pain. (Tr. 755-760).  Dr. Stock attempted aspiration of the lesion, but no fluid was able to be collected, thus revealing characteristics consistent with lipoma. (Tr. 756).  Dr. Stock diagnosed her with a lipoma on the posterior neck and prescribed her Diclofenac and Norco. (Tr. 756-757).  On January 6, 2013, Plaintiff went to the Ozarks Community Hospital with high blood sugar levels related to her diabetes. (Tr. 810-813).  She was instructed about the importance of controlling her sugar and taking medications along with insulin injections. (Tr. 810).

On January 10, 2013, Plaintiff underwent a mental consultative examination performed by Dr. H. Gene Chambers. (Tr. 729-733).  Plaintiff reported becoming significantly depressed again following her divorce in 2008. (Tr. 729).  She stated to Dr. Chambers that she went as long as a week without bathing or changing clothes. (Tr. 732).  Plaintiff did not have a driver's license.  (Tr. 732).  She managed her own finances. (Tr. 732).  Plaintiff reported she does not go out alone and lacked the motivation to perform household chores. (Tr. 732).  She stated she had to stop attending counseling at Ozark Guidance more than once because she could not

afford treatment. (Tr. 729). She also reported she was not taking any medications currently due to lack of funds. (Tr. 730). She smoked half a package of cigarettes a day, she stopped drinking alcohol in October 2012, and she reportedly had not done illegal drugs since she was 30 years old. (Tr. 730). Plaintiff had a depressed mood, flat affect, and was tearful throughout the examination process. (Tr. 731).

After a series of mental status questions, Dr. Chambers diagnosed her with major depression, recurrent; generalized anxiety disorder; and cannabis dependence in complete and sustained remission. (Tr. 732). Dr. Chambers found her GAF score to be 50-60. (Tr. 732). Dr. Chambers assessed that her capacity to communicate and interact in a socially adequate manner was mild to moderately limited based on her tearfulness. (Tr. 733). During the examination, it was easy for her to become emotionally upset and cry. (Tr. 733).

Her capacity to communicate in an intelligent and effective manner was found by Dr. Chambers to be within acceptable limits. (Tr. 733). Dr. Chambers noted her capacity to cope with typical mental or cognitive demands of basic work like tasks had mild to moderate limitations based on her mood and anxiety. (Tr. 733). Plaintiff's ability to attend and sustain concentration on basic tasks were within acceptable limits. (Tr. 733). Her capacity to sustain persistence in completing tasks were also mild to moderately limited based on mood and anxiety. (Tr. 733). Her capacity to complete work-like tasks within an acceptable time frame at present had moderate limitations based on her depressed mood and generalized anxiety. (Tr. 733). Dr. Chambers also found she was able to manage funds without assistance and no malingering was suspected. (Tr. 733).

On January 14, 2013, Plaintiff reestablished care with Dr. Kenneth Poemoceah. (Tr. 826-827). The plan Dr. Poemoceah created was for Plaintiff to check her blood sugars three

Dr. Poemoceah found that her diabetes was under moderate control, and she was to continue therapy with a referral to a dietician. (Tr. 822).   Dr. Poemoceah also diagnosed her with arthritis, hypertension, and anxiety, and refilled the corresponding medications. (Tr. 822).

On February 14, 2014, Plaintiff went to the emergency department of SSMH complaining of an abscess on her back. (Tr. 739-743).   The abscess was again incised and drained of pus. (Tr. 741).   Dr. Peter Plasse prescribed her Norco and Trimethoprim or Sulfamethoxazole. (Tr. 742).

On April 3, 2014, Plaintiff presented to Dr. Poemoceah complaining of pain in the left back and the paraspinal area radiating down the left arm along the radial aspect of the hand. (Tr. 820, 828-829).   Her blood sugar was elevated at 283. (Tr. 820).   Dr. Poemoceah diagnosed her with uncontrolled diabetes and switched her to Lantus from Glucophage and Metformin. (Tr. 820).   Dr. Poemoceah ordered a cervical spine MRI study and prescribed Hydrocodone for pain. (Tr. 820).

On April 11, 2014, Dr. Poemoceah chastised Plaintiff because she continued to smoke. (Tr. 818).   Her blood pressure was elevated at 180/99.   (Tr. 818-819).   She also forgot to bring blood sugar reports to the office visit. (Tr. 818).   Upon exam, she was neurologically intact, her neck was normal, and extremities were negative. (Tr. 818).   Plaintiff was diagnosed with hypertension and uncontrolled diabetes. (Tr. 818).   Dr. Poemoceah switched her Lantus to once a day at 20 units. (Tr. 818).

On April 16, 2014, the Plaintiff underwent a cervical spine MRI study. (Tr. 809, 830-831).   The results revealed broad based left posterior paracentral disc protrusion and moderate segmental spinal stenosis at C5-6, broad based right posterior paracentral disc protrusion and moderate segmental spinal stenosis at C6-7, generalized disc bulging and mild segmental

spinal stenosis at C3-4, and diffuse cervical degenerative disc disease. (Tr. 809). The exam was moderately limited by motion artifact. (Tr. 809). An addendum added to the report showed prominent anterior osteophytes at C2-3, C5-6 and C6-7, with smaller posterior osteophytes, and small anterior osteophytes at C3-4. (Tr. 809). There was also dorsal ligamentous hypertrophy probably due to facet joint arthrosis at C5-6 and C6-7. (Tr. 809).

On April 25, 2014, Plaintiff presented to Dr. Poemoceah complaining of chest pain. (Tr. 816-817). Dr. Poemoceah noted that her blood sugars had been doing fair, but not great. (Tr. 816). Dr. Poemoceah ordered a nuclear stress test due to her diabetes. (Tr. 816). Hydrocodone that she was currently taking four times a day was refilled and Lantus was increased up to 22 units. (Tr. 816).

Dr. Poemoceah, Plaintiff's treating primary care provider, submitted an undated Medical Source Statement (MSS) regarding her physical abilities with a copy of the cervical spine MRI study from April 16, 2014. (Tr. 875-877). In a checklist format, Dr. Poemoceah found she could frequently lift and/or carry five pounds one-third to two-thirds of the time during a typical eight-hour workday. (Tr. 875). She could also occasionally lift and/or carry five pounds. (Tr. 875). Plaintiff could stand and/or walk with usual breaks for half an hour. (Tr. 875). Dr. Poemoceah also found she could sit with usual breaks a total of four hours. (Tr. 875). Her push and pull abilities, including hand or foot controls, were also limited. (Tr. 876). She should never climb, balance, stoop, kneel, crouch, or crawl. (Tr. 876). Plaintiff can frequently reach, handle, finger, and feel. (Tr. 876). In addition, Dr. Poemoceah found her sight and speaking to be limited. (Tr. 876). However, no environmental restrictions were placed on the Plaintiff. (Tr. 876). Dr. Poemoceah opined that Plaintiff's limitations were the result of severe arthritis in her neck as well as knee and shoulder problems. (Tr. 876).

17

Dr. Poemoceah also reported that he included consideration of pain, discomfort, and/or other subjective complaints in his assessment of the Plaintiff's physical abilities. (Tr. 876).

On May 21, 2014, Plaintiff reported doing okay on current medications during an office visit with Dr. Poemoceah. (Tr. 856-857).   Dr. Poemoceah chastised the Plaintiff for not bringing a log of her blood sugar levels. (Tr. 856).   Her blood sugar was still consistently running high in the low 200s per Plaintiff's report. (Tr. 856).   Dr. Poemoceah diagnosed Plaintiff with hypertension, diabetes and anxiety, and refilled her medications. (Tr. 856).

On June 18, 2014, Dr. Poemoceah noted that Plaintiff's blood pressure was still up a little at 135/92. (Tr. 854-855).   Dr. Poemoceah increased Lisinopril to 30 mg.  (Tr. 854-855). Her blood sugars were still a little bit high, and Dr. Poemoceah decided to increase Lantus to 24 units. (Tr. 854).

On June 26, 2014, non-examining consultant, Dr. Diane Kogut completed a Case Analysis. (Tr. 108-109).   Dr. Kogut found Plaintiff's adaptive functioning was not severely limited by anxiety, and her condition appeared stable with prescription medication.  Dr. Kogut assessed that her mental impairments were not severe. (Tr. 109).

On June 26, 2014, non-examining consultant, Dr. Dan Gardner completed a Physical Residual Functional Capacity. (Tr. 100-101, 110-111).   Dr. Gardner found that Plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk with normal breaks for five hours, and sit with normal breaks for about six hours in an eight-hour workday. (Tr. 100, 110).   Her push and/or pull abilities were unlimited other than what was shown for lift and/or carry. (Tr. 100, 110).   She had no postural, manipulative, visual, communicative or environmental limitations. (Tr. 100, 110).   Dr. Gardner found that Plaintiff had the residual functional capacity to perform medium work. (Tr. 101, 111).

On July 6, 2014, Plaintiff presented herself to Siloam Springs Regional Hospital complaining of neck pain and stiffness after doing her paper route on rough roads. (Tr. 839-844).   An X-ray of Plaintiff's thoracic spine showed no acute abnormality, only slight dextroscoliosis in the mid thoracic spine and small scattered osteophytes in the mid to lower thoracic spine, likely T9-10. (Tr. 839).   An X-ray of her cervical spine revealed moderate cervical spine degenerative changes worst at C5-6 and C6-7. (Tr. 840).   She had stable cervical spine kyphosis since the November 5, 2008 comparison study. (Tr. 840).   Plaintiff was diagnosed with a cervical strain and prescribed Cyclobenzaprine and Diclofenac. (Tr. 844).

On July 17, 2014, Plaintiff went to see Dr. Poemoceah, and she reported continued neck pain and also shoulder pain. (Tr. 852-853).   Her blood pressure was also high at 170/92. (Tr. 853).   Upon exam, she was neurologically intact and her physical exam was normal, including her neck and extremities. (Tr. 852).   Dr. Poemoceah diagnosed her with degenerative joint disease, hypertension, and diabetes. (Tr. 852).   Dr. Poemoceah noted that Plaintiff's blood sugars were looking fair ranging in the mid-100s with a few aberrant readings, but overall doing pretty good. (Tr. 852).   The physician increased Hydrocodone to 7.5 mg. and added HCTZ to the Lisinopril. (Tr. 852).

On August 14, 2014, Plaintiff returned to Dr. Poemoceah for a refill of Hydrocodone. (Tr. 869-870).   She reported being moody, complaining, and hateful at times. (Tr. 869). Dr. Poemoceah started Celexa due to symptoms for anxiety and depression. (Tr. 869). Dr. Poemoceah noted that he would refer Plaintiff to a plastic surgeon for the lipoma on her posterior neck.  (Tr. 869).

On August 14, 2014, non-examining consultant, Dr. Steven Strode completed another Physical Residual Functional Capacity assessment when the case came upon reconsideration.

(Tr. 124-125).  Dr. Strode affirmed the opinion of Dr. Gardner and found that Plaintiff could perform medium work. (Tr. 125).

On August 15, 2014, non-examining consultant, Dr. Abesie Kelly completed another Case Analysis when the case came upon reconsideration. (Tr. 122-123).  Dr. Kelly noted that Plaintiff did not allege worsening mental ailments at the reconsideration level, there was no updated mental medical evidence was provided, and from a mental perspective, Dr. Kelley found she was functional. (Tr. 123).  Dr. Kelly concurred with Dr. Kogut's opinion that Plaintiff's alleged mental impairments were not severe. (Tr. 123).

On October 8, 2014, an additional report was added to the cervical spine MRI study dated April 16, 2014. (Tr. 871).  Dr. Nathan Kester assessed a probable lipoma within the dorsal subcutaneous tissues of the neck. (Tr. 871).  The lipoma appeared homogenous and demonstrated fat signal intensity on all of the imaging sequences. (Tr. 871).  No obvious invasion of the underlying musculature was noted.  (Tr. 871).  A fibrolipoma could not be excluded, but a liposarcoma was unlikely. (Tr. 871).

On October 9, 2014, Plaintiff reported to Dr. Poemoceah that she was doing well on current medications. (Tr. 865-866).  Dr. Poemoceah noted her blood sugars were elevated and increased Lantus to 32 units. (Tr. 865-866). Her weight during the office visit was 319.5 pounds. (Tr. 866).  Upon exam, she was neurologically intact, her neck was normal, and extremities were negative. (Tr. 865).  The goal was to work on weight reduction and obtain proper shoes. (Tr. 865).

On November 6, 2014, Dr. Poemoceah noted that Plaintiff's blood sugars were running in the upper 100s to low 200s. (Tr. 863-864).  Dr. Poemoceah increased Lantus to 35 units. (Tr. 863).

20

On December 4, 2014, Plaintiff presented to Dr. Poemoceah after being hospitalized for high blood pressure. (Tr. 861-862). Her blood pressure during the office visit was 153/101. (Tr. 862). Plaintiff was diagnosed with degenerative joint disease and was given Ambien to help with insomnia. (Tr. 861).

### III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § § 423(d)(1)(A), 1382c (a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable

21

by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(C). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

IV.    **Discussion:**

Plaintiff argues the following issues on appeal:  1) Whether the ALJ erred in finding her subjective complaints of neck pain less than fully credible; 2) Whether the ALJ erred in his RFC determination; and 3) Whether the ALJ erred by relying upon interrogatory responses from the VE at Step Five in the sequential evaluation of her disability claim. (Doc. 11).

A.    **Subjective Complaints and Credibility Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5)

22

functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards, 314 F.3d at 966.

The ALJ acknowledged in the decision that Plaintiff's severe impairments limit her work to the light exertional level, and "due to her lipoma and degenerative disc disease, she can only frequently rotate, flex and extend her neck and frequently reach in all directions." (Tr. 22).  Nevertheless, the ALJ found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence, and the evidence as a whole shows that she is not as limited as alleged."  (Tr. 22).  However, Plaintiff argues there was not substantial evidence in the ALJ's decision to support a finding that her neck pain was not as severe as she alleged. (Doc. 11).  Plaintiff also contends the ALJ never presented any evidence that shows her lipoma and degenerative disc disease are not as severe as the doctors' claim and as painful as she testified to at the hearing. (Doc. 11).  After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints.

While the record reveals that Plaintiff has a history of lipoma and neck pain, her pain appears to be well-controlled with conservative treatment.  See Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998); Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain).  Plaintiff's treatment for her neck impairments, including the degenerative disc disease of her cervical spine, merely

consisted of pain relievers, muscle relaxants, and anti-inflammatories with minimal reported side effects.  None of her physicians suggested treatment beyond prescription medications for her degenerative disc disease.  Based on the record, prescription medications were the only type of treatment the Plaintiff requested from her medical providers.  In regards to the lipoma, Plaintiff was advised on three separate occasions to have it surgically removed, but the record did not show that Plaintiff took steps toward removal besides her testimony that she is in talks with someone to possibly remove it. (Tr. 56-57, 586, 561, 869); Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (a failure to follow a recommended course of treatment also weighs against a claimant's credibility).

Plaintiff also engaged in activities that discounted her credibility.  She continued smoking despite medical advice to quit. (Tr. 818).  Plaintiff's history of not taking prescribed medications, mainly for hypertension and diabetes control, also weighed against her credibility. (Tr. 453, 569, 643, 677, 730, 822); See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).  Although she stated her noncompliance was due to a lack of funds, there was no evidence in the record that she sought assistance in order to obtain her medication at little or no cost.  See Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992) (holding that lack of evidence that claimant sought low-cost medical treatment from her doctor, clinics, or hospitals does not support claimant's contention of financial hardship).  The record further reveals that Plaintiff was able to produce funds to consume alcohol and smoke cigarettes during the relevant time period.  Plaintiff admitted to consuming alcohol until October 2012, and she continued smoked cigarettes at least until April 2014. (Tr. 730, 818).  See Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999).

Plaintiff's daily activities were not as limited as she alleged.  A review of the record shows that Plaintiff performed house cleaning; washed dishes; did her own laundry; prepared meals; shopped; cared for pets; spent time with others; babysat a young child for a stint during the relevant time period; and took care of most of her personal needs with no issues. (Tr. 277-280, 326-329, 362-365, 565).  In addition, the ALJ determined that Plaintiff had no past relevant work because only a few times in the last 15 years did her earnings rise to the level of substantial gainful activity. (Tr. 261).  Plaintiff testified that her only work since the alleged onset date was helping her sister deliver newspapers. (Tr. 45).  The ALJ found Plaintiff's lack of work activity in the 15 years prior to her alleged onset date further lessened the weight that could be given to her subjective complaints. (Tr. 23); Julin v. Colvin, 826 F.3d 1082, 1087 (8th Cir. 2016) (holding the ALJ permissibly considered the claimant's poor employment history suggested a lack of motivation to work).

With regard to the Third Party Function Reports and testimony provided by Plaintiff's daughter, the ALJ properly considered this evidence but found it unpersuasive.  This determination was within the ALJ's province.  See Siemers v. Shalala, 47 F.3d 299, 302 (8th Cir. 1995); Ownbey v. Shalala, 5 F.3d 342, 345 (8th Cir. 1993).

Although it is clear that Plaintiff suffers with some degree of limitation, she has not established that she is unable to engage in any gainful activity.  ALJs are "in a better position to evaluate credibility," and we defer to the ALJ's credibility determination because it was supported by "good reasons and substantial evidence."  Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).  Based upon the foregoing, as well as for those reasons given in Defendant's well stated brief, the undersigned believes there is substantial evidence to support the ALJ's credibility analysis.

25

**B.      RFC Determination:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace.  Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC."  Id.

In determining that Plaintiff maintained the RFC to perform light work with limitations, the ALJ considered Plaintiff's subjective complaints; her medical records; and the provided medical assessments. (Tr. 17-18).  Substantial evidence supports the ALJ's RFC determination. In July 2010, Dr. Morgan, a physical consultative examiner, found Plaintiff had a normal range of motion in all areas, including her neck and upper extremities, with no muscle spasms, atrophy, or weakness. (Tr. 438-439).  Dr. Morgan assessed that Plaintiff had mild limitations to walk, stand, lift, or carry with the ALJ giving credit to the opinion. (Tr. 24, 440).

The ALJ also discussed relevant objective medical evidence including the cervical spine MRI study on April 16, 2014.  The study revealed degenerative disc disease, disc bulging, disc protrusion, spinal stenosis, and lipoma. (Tr. 809, 830-831).   Shortly thereafter on

July 6, 2014, Plaintiff presented to the emergency department complaining of neck pain and stiffness after performing a paper route on a dirt road. (Tr. 841).  An X-ray of her thoracic spine showed no acute abnormality, and a cervical spine X-ray revealed moderate degenerative changes at C5-6 and C6-7 with stable cervical spine kyphosis since a 2008 study. (Tr. 839-844).  She was only diagnosed with a cervical strain and no functional deficits were noted. (Tr. 844).

Even the Plaintiff's primary care physician, Dr. Poemoceah, found during multiple physical examinations that she was neurologically intact, had normal neck exams, and her extremities exams were negative. (Tr. 818, 822, 852, 865).  This evidence contradicts the medical assessment Dr. Poemoceah submitted where he found Plaintiff could frequently lift and/or carry five pounds; stand and/or walk for one-half hour; sit with usual breaks for four hours during an eight-hour workday; and never climb, balance, stoop, kneel, crouch, or crawl. (Tr. 875-877).  Dr. Poemoceah noted Plaintiff's assessed limitations were due to her neck, knee, and shoulder issues with a copy of the April 2014 MRI study attached.  (Tr. 876-77).

Based on the treatment records, however, Dr. Poemoceah managed Plaintiff's impairments conservatively with prescription medications, and the Plaintiff reported at a more recent visit that she was doing well with medications. (Tr. 816-820, 822-829, 852-857, 861-866, 869-870).  Dr. Poemoceah made only one referral for further treatment, and the referral was to a plastic surgeon for Plaintiff's lipoma removal. (Tr. 869).

Although the ALJ did not assign weight to Dr. Poemoceah's opinion, given the ALJ's specific references to the assessment, it is highly unlikely that the ALJ did not consider and reject Dr. Poemoceah's opinion. (Tr. 20); See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995).   Nevertheless,

Dr. Poemoceah's treatment history of the Plaintiff did not support the conclusions he made in his assessment. The record also contains medical opinions from Dr. Morgan and non-examining agency medical consultants that contradict Dr. Poemoceah's assessment, and the ALJ provided reasons for the weight he afforded to each of those opinions. (Tr. 23-24, 100-101, 110-111, 124-125, 436-448). The ALJ also considered Plaintiff's reading impairment in the RFC determination by limiting her to jobs that do not require complex written communication. (Tr. 18). Consequently, the records relating to the relevant time period do not support the severe limitations alleged by the Plaintiff.

Based upon the foregoing, the undersigned finds there is substantial evidence to support the ALJ's RFC determination.

### C.    Interrogatory Responses and Vocational Expert:

Plaintiff contends the ALJ committed reversible error by relying on the VE's responses to the interrogatory questions rather than the VE's testimony at the hearing. (Doc. 11). Plaintiff further argues the ALJ disregarded the VE's hearing testimony because the testimony precluded the Plaintiff from any work in the local economy in favor of a set of interrogatories the ALJ sent to the VE post-hearing which posed substantially similar hypotheticals. (Doc. 11). At the hearing, the VE's testimony included answers to a series of hypotheticals presented by the ALJ and responses to follow up questions posed by Plaintiff's attorney. Jobs the VE originally cited to in the first, second, and third hypotheticals posed by the ALJ would be precluded if based solely on the VE's personal observations of production assembly work. (Tr. 74-86). However, pursuant to the Dictionary of Occupational Titles (DOT), the VE testified that Plaintiff would be able to perform the jobs she previously listed. (Tr. 74-86).

The ALJ sought further insight and submitted interrogatories to the VE post-hearing. The ALJ asked the VE if her responses were based upon the DOT, its companion publications, and her professional experience, and the VE responded affirmatively. (Tr. 425).   In Interrogatory Number One to the VE, the ALJ posed the following hypothetical:

> Assume an individual with the same age, education and work experience as outlined above where the individual is able to L/C 20 lbs. occ; L/C 10 lbs. freq; S/W 6/8 hrs. WNB; Sit 6/8 hrs. WNB; P/P with limits pursuant to L/C limitations; Rotation, flexion, extension of neck – freq; Reach (incl. OVH) bilaterally – freq; Foot Control Operation on the right – freq; limited to jobs that do not require complex written communication.

> Could an individual with these limitations perform [Plaintiff's] past work either as it was actually performed or as it was customarily performed pursuant to the DOT?  If not, or in the alternative, are there jobs that exist in the regional or national economies that the individual can perform?  If so, please give the number of jobs available.

(Tr. 426).

The VE's response to Interrogatory Number One was that Plaintiff could perform past work as a production assembler and newspaper deliverer, and she listed how many jobs existed in the regional and national economies for each position. (Tr. 428).   In his RFC determination, the ALJ ultimately decided to rely upon the hypothetical he posed in Interrogatory Number One and the VE's responses thereafter. (Tr. 17-18).  The ALJ also found the Plaintiff had no past relevant work, and he considered the occupations of production assembler and newspaper deliverer as other work for purposes of the Step Five analysis. (Tr. 25).

Reviewing the ALJ's determination under the deferential substantial evidence standard, we find it is up to the ALJ to resolve issues between crediting a DOT listing and VE testimony regarding personal experience.  Jones v. Astrue, 619 F.3d 963, 978 (8th Cir. 2010); See Welsh v. Colvin, 765 F.3d 926, 930 (8th Cir. 2014) (a VE must offer an explanation for any inconsistencies between her testimony and the DOT, which the ALJ may accept as reasonable after evaluation); see also Porch v. Chater 115 F.3d 567, 572 (8th Cir. 1997) (when expert

29

testimony conflicts with the DOT, and DOT classifications are not rebutted, the DOT controls). We defer to the ALJ's decision to utilize the hypothetical and VE responses to Interrogatory Number One in his RFC determination.

The ALJ properly proffered the interrogatories to the Plaintiff's attorney. (Tr. 429-430). Filing an untimely objection, Plaintiff's attorney disagreed with the jobs the VE found Plaintiff capable of performing and how the number of jobs for each occupation was reached. (Tr. 432-434).   After thoroughly reviewing the entire evidence of record, the Court finds the hypothetical the ALJ posed to the VE in Interrogatory Number One fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. (Tr. 425-428); Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).  Accordingly, the Court finds that the VE's responses constitute substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing work as a production assembler and newspaper deliverer.  Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from VE based on properly phrased hypothetical question constitutes substantial evidence).

Pursuant to Social Security Ruling (SSR) 00-4p, the ALJ must ask about any possible conflict between VE evidence and information provided in the DOT.  In this case, the ALJ satisfied this requirement by asking the VE in the preliminary questions what her interrogatory responses were based upon, and the VE responded the answers were based upon the DOT, its companion publications, and her personal experience. (Tr. 425).  In addition, there were no conflicts to resolve because the VE's findings that Plaintiff could perform work as a production assembler and newspaper deliverer were consistent with the DOT and its companion

30

publication, the Selected Characteristics of Occupations (SCO), and the ALJ acknowledged this consistency in his decision. (Tr. 25, 428).

## V.    Conclusion:

Accordingly, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 22nd day of January, 2018.

/s/   *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE